**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| In re Hypercom Corporation Securities Litigation | No. CV-05-0455-PHX-NVW<br><br>**ORDER** |

The Court has before it Plaintiffs' Consolidated Amended Class Action Complaint Doc. #48; Defendants' Motion to Dismiss, Doc. # 53; Plaintiffs' Response to Defendants' Motion to Dismiss, Doc. # 65; Defendants' Reply to Plaintiffs' Response, Doc. # 68; Defendants' Declaration in Support of their Motion to Dismiss, Doc. # 54; and Defendants' Request for Judicial Notice, Doc. # 55.

Defendants bring this motion pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, on the ground that the Complaint fails to state a claim against Defendants.

**I.    Statement of the Case**

This case began with separate actions. On May 31, 2005, the court granted a motion to consolidate the actions, Doc. # 42, and on June 9, 2005, the court appointed a lead plaintiff and counsel. On August 8, 2005, a Consolidated Class Action Complaint ("Complaint") was filed.

As set forth in the Complaint, Defendant Hypercom is a Delaware corporation that maintains its principal place of business in Phoenix, Arizona. Doc. # 48 at ¶ 13. Hypercom manufactures, designs, sells, and leases end-to-end electronic payment solutions. *Id.* at ¶ 22. Its securities are traded on the New York Stock Exchange. *Id.* at ¶ 19. At all relevant times, Defendant Alexander was Hypercom's Chairman of the Board, President, and CEO, *Id.* at ¶ 15, and Defendant Smolak was Hypercom's Executive Vice President and Chief Financial and Administrative Officer. *Id.* at ¶ 16.

On February 4, 2005, Hypercom announced that it was restating its financial statements for the first three quarters of 2004 because 3,200 leases entered into by Hypercom's UK subsidiary, Hypercom EMEA, Inc., had been improperly accounted for as sales-type leases, rather than operating leases. Doc. # 54, Exhibit 5, Exhibit 99.1 at 3. Pursuant to Generally Accepted Accounting Principles ("GAAP"), companies structure their leases as either operating leases or sales-type leases. Doc. # 48 at ¶ 23. Such characterization determines how payments to the lessor are recorded. *Id.* at ¶ 24. With an operating lease, the lessor is able to record revenue as it becomes receivable according to the provisions of the lease. *Id.* With a sales-type lease, the lessor may recognize all of the revenue from that lease, except for interest and maintenance, up-front. *Id.*

Hypercom's misclassification resulted in a premature recognition of $3.2 million in revenue and $2.1 million in net income. Doc. # 53 at 2. On March 3, 2005, Hypercom filed a Form 8-K with the SEC, attaching a copy of its press release for that day, which stated, "As previously disclosed, the significant internal control deficiency that caused the recent accounting reclassification of certain leases from sales-type to operating leases and gave rise to a restatement of 2004 interim period financial statements, represents a material weakness in internal controls over financial reporting as defined by PCAOB's Auditing Standard No. 2." Doc. # 54, Exhibit 5, Exhibit 99.1 at 1. The same press release also stated that

Hypercom expected its independent auditors, Ernst & Young LLP, to issue an adverse opinion with respect to Hypercom's internal controls over financial reporting. *Id.*

Following the press release, Hypercom's stock fell by $1.00 per share, or 18.32 percent. Doc. # 48 at ¶ 6. Shortly thereafter, Hypercom announced the resignation of Christopher S. Alexander ("Alexander"), its Chief Executive Officer ("CEO") and Chairman of the Board, and John W. Smolak ("Smolak"), its Chief Financial Officer ("CFO").

Plaintiffs bring this action against four defendants: (1) Hypercom; (2) Hypercom EMEA, Inc., Hypercom's 100% owned subsidiary; (3) Alexander; and (4) Smolak.

Plaintiffs allege (1) that all Defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and its implementing regulation, Rule 10b-5 promulgated in 17 C.F.R. § 240.10b-5(b), and (2) that Alexander and Smolak violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Defendants filed a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted, arguing that Plaintiffs failed to plead scienter with the requisite particularity.

## II.  Legal Standard

### A.  General Standard Governing Motions to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), the court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994). When analyzing a complaint for failure to state a claim, all factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *See Iolab Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1504 (9th Cir. 1994). All reasonable inferences are to be drawn in favor of the plaintiff. *Jacobsen v. Hughes Aircraft*, 105 F.3d 1288, 1296 (9th Cir. 1997). When the complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."

1  *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).
2  Leave to amend is properly denied "where the amendment would be futile." *DeSoto Yellow*
3  *Freight Sys.*, 957 F.2d 655, 658 (9th Cir. 1992).

4      For the purposes of considering Defendants' Rule 12(b)(6) motion, the court will
5  consider documents submitted by Defendants that were referenced by the Complaint, the
6  authenticity of which Plaintiffs have not questioned. *See No. 84 Employer-Teamster Join*
7  *Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 924 n.2 (9th Cir. 2003).
8  Therefore, Exhibit 1 will be considered to the extent necessary because Plaintiffs referred to
9  the Statement of Financial Accounting Standards No. 13 Accounting for Leases in their
10 Complaint. Doc. # 48 at ¶¶ 64-5.

11     Defendants also ask the court to take judicial notice of (1) an excerpt from
12 Hypercom's proxy statement that it filed with the SEC on April 6, 2005, Exhibit 2; (2) an
13 excerpt of Hypercom's proxy statement that it filed with the SEC on April 27, 2005, Exhibit
14 3; (3) an excerpt from the report Ernst & Young provided to the Hypercom board of directors
15 and shareholders on March 11, 2005, which Hypercom filed with the SEC, Exhibit 4; and (4)
16 a copy of Hypercom's March 3, 2005 press release that it filed with the SEC on that same
17 day, Exhibit 5. Courts may take judicial notice of SEC filings. *See Allison v. Brooktree*
18 *Corp.*, 999 F. Supp. 1342, 1353 n.3 (S.D. Cal. 1998) ("Judicial notice of documents required
19 to be filed by law is appropriate."). Defendants ask the court to take judicial notice of
20 Exhibits 2 and 3 to demonstrate that Defendants Alexander and Smolak did not sell
21 Hypercom stock during the class period. Because Plaintiffs have not alleged otherwise, the
22 court declines at this time to take judicial notice of Exhibit 2 and Exhibit 3. As to Exhibits
23 4 and 5, the Complaint directly references those two SEC filings. Doc. # 48 at ¶ 69-70. The
24 court will take judicial notice of Exhibits 4 and 5.

### B. Pleading Requirements in Securities Fraud Actions

To state a claim for securities fraud under Section 10(b) of the 1934 Act and Rule 10b-5, a complaint must overcome three pleading barriers. First, it must comport with Rule 8(a) of the Federal Rules of Civil Procedure, which requires that complaints provide a short and plain statement of the claim.

Second, it must conform with the "particularity" obligations imposed by Rule 9(b) of the Federal Rules of Civil Procedure. *In re GlenFed, Inc. Sec. Litig.*, 42 F. 3d 1541, 1545 (9th Cir. 1994). Rule 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind may be averred generally."

Third, it must meet the pleading requirements provided in the Private Securities Litigation Reform Act ("PSLRA"). The PSLRA amplifies the "particularity" obligations of Rule 9(b) by requiring that the complaint specify "each statement alleged to have been misleading," and by requiring that the complaint specify the reason or reasons why the statement was false or misleading. 15 U.S.C. § 78u-4(b)(1). "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* Moreover, the PSLRA provides that the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter. *Id.* at (b)(2). The required state of mind is one of "deliberate recklessness." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 975 (9th Cir. 1999). "Recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional conscious misconduct." *Id.* at 977.

Therefore, plaintiffs must "plead, at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness." *Id.* at 979. A reasonable inference is not enough. *Id.* at 974. A complaint merely alleging that a defendant had the motive and opportunity to commit fraud is insufficient. *Id.* In assessing whether Plaintiffs have

- 5 -

sufficiently pled scienter, courts consider the totality of the allegations. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004)(omitting quotations and citations). Additionally, courts must consider all reasonable inferences, not just those favorable to the plaintiff. *Id.*

Applying these standards, the inquiry before the court is whether the Complaint, read most favorably to Plaintiffs, but considering all reasonable inferences, alleges sufficiently particular facts to raise a strong inference that a given Defendant participated in the making of fraudulent representations or omissions, either with knowledge of their falsity or with deliberate recklessness.

### III.   Analysis

Defendants allege that Plaintiffs have failed to plead scienter because the Complaint, in its totality, does not support a strong inference of knowing or deliberately reckless misconduct. In response, Plaintiffs contend that Hypercom's financial restatement, the GAAP violation, the subsequent resignations of Smolak and Alexander at Hypercom, the confidential witnesses' allegations, Hypercom's detail-oriented management style, the fact that the accounting error involved a "core" product, and Defendants' motivations and opportunity demonstrate that Defendants acted with deliberate recklessness.

#### A.   The Allegations that May Demonstrate Scienter

##### 1.   The Financial Restatement

On February 4, 2005, Hypercom issued a financial restatement, reducing its 2004 revenue by $3.2 million and its 2004 net income by $2.1 million, because of a misclassification of its leases. Specifically, Hypercom adjusted (1) its first quarter net income from a loss of $2.2 million to a loss of $2.9 million, (2) its second quarter net income from a loss of $9.4 million to a loss of $10.5 million, and (3) its third quarter net income from a profit of $584,000 to a profit of $309,000.

- 6 -

1   As part of the news release, as discussed above, Hypercom stated that a "significant internal control deficiency" caused the reclassification of the leases. Doc. # 54, Exhibit 5, Exhibit 99.1 at 1. Hypercom also stated that the reclassification "represents a material weakness in internal controls financial reporting." *Id.*

Defendants argue that the small size of Hypercom's financial restatement detracts from any inference that they acted with scienter. Restatements are less probative of deliberate wrongdoing or recklessness when the issuer's financial adjustments are small in size. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 686 (6th Cir. 2004) (determining that a downward restatement of income of $1.3 million for a company with $280 million in revenue and $75 million in total assets for that year did not present a strong inference of scienter). The converse is also true: the greater the magnitude of the restatement or GAAP violation, the more likely that such a restatement or violation was made consciously or recklessly. S*ee id.* at 685.

Here, while Hypercom's adjustments cannot be considered "small," they are not of the magnitude typically found to support a strong inference of scienter. For example, in *In re MicroStrategy, Inc. Secs. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000), the plaintiffs alleged that MicroStrategy fraudulently reported a "record" net income of $18.9 million over three years, when the company actually incurred a net loss for those years of more than $36 million. The *MicroStrategy, Inc.* court stated that the "magnitude," "pervasiveness," and "repetitiveness" of the company's violations of "simple" accounting principles "serve[] to amplify the inference of scienter." *Id.* By contrast, Hypercom never stated that it was profitable when it was not. In total, the adjustment of net income was only $2.2. million, compared with MicroStrategy's adjustment of nearly $50 million. Furthermore, Hypercom still received the revenue at issue–it only changed the period in which the revenue was recorded.

### 2. The GAAP Violations

Plaintiffs also contend that the obvious nature of Hypercom's GAAP violations creates a strong inference that Defendants acted with scienter. However, Plaintiffs have not cited any cases standing for the proposition that GAAP violations alone can establish scienter. Indeed, while "[v]iolations of GAAP standards can . . . provide evidence of scienter," *In re Daou Systems, Inc. Sec. Litig.*, 411 F.3d 1006, 1016 (9th Cir. 2005)(citations omitted), bare allegations of GAAP violations do not create a strong inference thereof. *In re McKesson Hboc Secs. Litig.*, 126 F. Supp.2d 1248, 1272-73 (N.D. Cal. 2000). Thus, the fact that a company made an accounting error in violation of GAAP, and subsequently issued a financial restatement and a culpability statement, does not alone satisfy the PSLRA's pleading requirement. *See In re Alpharma Sec. Litig.*, 372 F.3d 137, 150 (3d Cir. 2004) (determining that the plaintiffs failed to allege that any of the defendants, including Alpharma's CEOs, CFO, and President of the Animal Health Division, were involved in any way with the violations of GAAP). *Cf. DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (requiring that the plaintiffs still prove facts demonstrating deliberate recklessness even though the accounting firm had negligently missed obvious violations of GAAP).

Furthermore, even assuming that establishing the obviousness of a GAAP error could in fact establish a strong inference of scienter, Plaintiffs have not alleged sufficient facts to make such a showing. Confidential Witness No. 1 alleges that the "the rental agreements were 'very straightforward' and there was no question that they were simply 'strict rental agreements' and not sales or purchase agreements." Doc. # 48 at ¶ 27. Confidential Witness No. 1 is not an accountant, and his conclusory claim alone does not establish the obviousness of the GAAP violation. Plaintiffs do dedicate a portion of their Complaint to the GAAP violation, *Id.* ¶¶ 56-65, but they do not allege facts establishing the obviousness of the lease misclassification. Merely alleging that a GAAP violation occurred does not establish the

obviousness of the incorrect classification. Additional facts are necessary. Thus, Plaintiffs have failed to allege with particularity that the lease misclassification was obvious.

### 3. The Confidential Witnesses

Plaintiffs rely on five confidential witnesses to help demonstrate that Alexander and Smolak acted with deliberate recklessness. In response, Defendants argue that (1) Plaintiffs have failed to plead facts demonstrating the reliability of each of the CWs' allegations, and (2) the information provided by the CWs does not establish that Alexander and Smolak deliberately or recklessly caused Hypercom to publish erroneous financial results.

#### a. Standard for Confidential Witness Allegations

"[P]ersonal sources of information relied upon in a complaint should be described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Systems, Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (citations and quotations omitted). Plaintiffs need not name their sources "so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." *Id.* The *Daou* court concluded that the plaintiffs satisfied the PSLRA requirements for confidential witnesses when they described the witnesses with a large degree of specificity, including each confidential witness's job description and work responsibilities, and attributed each allegation to a specific witness. *Id.* at 1016.

Allegations made by confidential witnesses cannot support an inference of scienter if the plaintiff fails to plead the requisite detail regarding the job description and duties of that confidential witness. *See In re Bus. Objects S.A. Secs. Litig.*, 2005 U.S. Dist. LEXIS 20215, *16-17 (N.D. Cal. 2005) ("[U]nlike in *Daou Systems*, the Amended Complaint provides no more than the job title of the confidential witnesses. For example, plaintiffs state the exact job title of their first confidential witness–the Senior Director of Customer Technical Support–but fail to provide any other detail regarding his or her job description

1  and responsibilities."); *In re Exodus Communs., Inc. Secs. Litig.*, 2005 U.S. Dist. LEXIS 20222, *95-6 (N.D. Cal. 2005) (not considering allegations from confidential witnesses when there was no explanation for how the confidential witnesses obtained the relevant information).

### 1. Confidential Witness No. 1

The Complaint alleges that "Confidential Witness No. 1 ("CW-1"), a former Managing Director of EMEA, understands the relationship between EMEA and Hypercom. CW-1 alleges that EMEA's business is very straightforward, and that EMEA personnel handle only the "salesman" aspect of the business. Doc. # 48 at ¶ 26. CW-1 further alleges that all other aspects of Hypercom's business, including drafting the lease contracts and making accounting decisions, were handled by Hypercom's headquarters in Phoenix, AZ. *Id.* CW-1 also alleges that, for every month and accounting period, EMEA transmits its leasing figures to Defendant Smolak and Rob Vreland, Hypercom's U.S. Controller. *Id.* at ¶ 28. The Complaint alleges CW-1's title, attributes specific allegations to CW-1, and from his allegations the court can deduce his job description and responsibilities. Furthermore, it is reasonable that a managing director of EMEA would know the information CW-1 alleges. Therefore, as to CW-1, the Complaint comports with *Daou*. CW-1's allegations contribute to an inference of scienter.

### 2. Confidential Witness No. 2

Plaintiff's Complaint alleges significantly fewer facts about Confidential Witness No. 2 ("CW-2"). Plaintiffs allege only that CW-2 corroborates CW-1's statements, that Hypercom employed CW-2 as an accountant in Hypercom's Accounting Department, that CW-2 worked for Hypercom through August 2004, and that "[a]cording to CW-2, who was on a first name basis with defendant Alexander, defendant Smolak was one of the only people at the Company who would have known about how the EMEA leases were structured and booked." *Id.* at ¶ 29. Plaintiffs fail to allege any facts explaining how CW-2 would know about Defendant Smolak's involvement with the leases and their classification for accounting purposes. Plaintiffs do not allege any facts describing CW-2's job description,

- 10 -

other than alleging that CW-2 is an accountant. Under *Dauo*, Plaintiffs have failed to allege sufficient facts demonstrating the reliability of CW-2's allegations. Thus, CW-2's allegations do not contribute to an inference of scienter.

### 3. Confidential Witness No. 3

Plaintiffs allege that Hypercom employed Confidential Witness No. 3 ("CW-3") as an accountant through August 2004, and CW-3 alleges that all "decisions to book revenue were made jointly by defendant Smolak, Vreland, and Hypercom senior vice president of finance, treasury and investor, Scott Tsujita." *Id.* at 29. CW-3 alleges that Smolak maintained "tight control" over the accounting department and "'questioned everything' because Hypercom had no internal auditing person or group." *Id.* at ¶ 29. CW-3 alleges that the decision to book the leases incorrectly was intentional because management questioned all aspects of accounting. *Id.* Plaintiffs do not allege any facts describing CW-3's accounting position or his job responsibilities. Plaintiffs do not allege how CW-3 would know that Smolak reviewed all of the leases or that Smolak determined how the leases were to be classified for accounting purposes. While CW-3's allegations are relevant to the question of Smolak's knowledge, they must be considered mere conclusory statements that are not reliable under *Daou* because there are no supporting facts demonstrating the reliability of CW-3's allegations. Thus, CW-3's allegations do not contribute to an inference of scienter.

### 4. Confidential Witness No. 4

Plaintiffs allege that Hypercom employed Confidential Witness No. 4 ("CW-4") as an accountant at Hypercom's headquarters until June 2005. CW-4 alleges that Hypercom intentionally mischaracterized the leases to "increase and inflate Hypercom's bottom line profits." *Id.* at ¶ 30 (quotations omitted). CW-4 further alleges that the sole reason Hypercom corrected its 2004 financial figures was because Ernst & Young, Hypercom's outside auditors, discovered the incorrect classification. *Id.* CW-4 claims that he noticed a suspicious moneyless wire-transfer that EMEA sent to Hypercom's headquarters, which CW-4 pointed out to his supervisors, who directed him to post the transfer to Hypercom's books. *Id.* at ¶ 32. In addition, CW-4 alleges that Smolak "had to know about the transfer because

of his strict oversight of EMEA's accounting and finances." *Id.* Finally, CW-4 claims that Smolak and Alexander were only concerned with impressing shareholders, not with proper accounting practices, and that Ernst and Young discovered the wire transfer and called it "suspicious." *Id.* at ¶¶ 32, 33.

Plaintiffs fail to allege sufficient facts regarding CW-4's duties and responsibilities so as to comply with *Daou*. The only facts alleged in Plaintiffs' Complaint regarding CW-4's duties are that CW-4 personally reviewed the accounting paperwork EMEA sent to Hypercom's headquarters. There are no additional facts explaining how CW-4 learned that Smolak knew about the error in the lease classifications or about any of CW-4's other allegations. While CW-4's allegations may be probative on the question whether Defendants acted with scienter, Plaintiffs have failed to plead sufficient facts establishing the reliability of CW-4's allegations. *See In re Metawave Communs. Corp. Secs. Litig.*, 298 F. Supp.2d 1056, 1058 (W.D. Wash. 2002) ("The Court must be able to tell whether a confidential witness is speaking from personal knowledge, or merely regurgitating gossip and innuendo."(citations and quotations omitted)). Therefore, CW-4's allegations do not contribute to an inference of scienter.

### 5. Confidential Witness No. 5

Plaintiffs allege that Confidential Witness No. 5 ("CW-5") "confirmed the problems at Hypercom. CW-5 is a former Accounting Manager, who was employed at Hypercom from before the Class Period through June[] 2005. CW-5 stated (as did CW-3) that Hypercom had no internal audit practice and that the problems with the UK leases were not resolved until Ernst & Young refused to sign off on an audit in early 2005." Doc. # 48 at ¶34. Again, Plaintiffs do not allege any facts regarding CW-5's reliability. While it is conceivable that an Accounting Manager would know such facts, Plaintiffs fail to provide the necessary job duties and responsibilities. Merely providing an employee's title does not comply with *Daou*. CW-5's allegations do not contribute to an inference of scienter. Even if these allegations are true, they do not go directly to whether the Defendants knew that the EMEA lease accounting classifications were wrong.

1    Because Plaintiffs failed to allege necessary facts regarding most of the confidential
2    witnesses, the court cannot adopt wholesale all of the allegations provided by the unnamed
3    employees in Plaintiffs' Complaint. Therefore, "the court will rely only on factual allegations
4    which evince reliability through detail, context and corroboration." *In re Portal Software,*
5    *Inc. Secs. Litig.*, 2005 U.S. Dist. LEXIS 20214, *26 (N.D. Cal. 2005).  Only CW-1's
6    allegations meet the standard enunciated in *Daou*.  None of the remaining Confidential
7    Witnesses' allegations, even if probative, will be considered for the purpose of determining
8    whether Defendants acted with knowledge or deliberate recklessness.

### b.     Statements Made By Confidential Witnesses

10    Defendants argue that the confidential witnesses have not provided any facts relevant
11   to whether Defendants Smokak or Alexander were aware of the misclassification of the
12   leases. CW-1, as discussed above, was a Managing Director of EMEA, and his allegations
13   will be considered for the purpose of determining whether the Complaint raises a strong
14   inference of scienter.  According to the Complaint, people at Hypercom's headquarters
15   drafted the leases and made the accounting decisions. While not identifying either Alexander
16   or Smolak, this allegation establishes that Hypercom and not EMEA made the accounting
17   decisions. CW-1 further alleges:

> At the end of each month (and at the end of every quarter), EMEA would transmit to defendant Smolak and Rob Vreland ("Vreland"), Hypercom's U.S. Controller, its leasing figures and revenues. According to CW-1, it was not possible for EMEA, unbeknownst, to have incorrectly booked revenue or lease figures and then sent them to the U.S.–because all figures were "double-checked" by Smolak and Verland before they were recorded. CW-1 further stated that in the event that the figures sent by EMEA were wrong, Smolak or Vreland would have known.

Doc. # 48 at ¶ 28. CW-1's allegation that Smolak "double-checked" all of the figures is probative on the question whether Smolak acted with deliberate recklessness or knowledge. The allegation is also probative on the question of whether EMEA improperly classified the leases or whether Hypercom did so.

CW-1 also alleges that the rental contracts were "'very straightforward' and there was no question that they were simply 'strict rental agreements' and not sales or purchase

- 13 -

agreements. *Id.* at ¶ 27. CW-1 further alleges that Hypercom's headquarters generated all of the leases and that there was never "anything" in any lease contract that would make it unclear that the lease was anything but a simple "rental." *Id.* at ¶ 27. There are three problems with these allegations. First, it is unclear how CW-1, who is not an accountant, knows that the GAAP classification of the lease is "'very straightforward.'" Second, the allegation does not establish Smolak or Alexander's involvement with the misclassification. CW-1's allegations could simply mean that EMEA misclassified the leases and Smolak failed to notice the error. It does not necessarily follow that because Hypercom created the leases, Hypercom explicitly defined how the leases were to be accounted for pursuant to GAAP. Third, as discussed above, demonstrating that the GAAP violations were obvious does not necessarily establish scienter. Plaintiffs need to plead particularized facts establishing a strong inference that Defendants acted with scienter, not mere negligence. CW-1's conclusory allegations regarding the simplicity of the leases does not aid a court in understanding why and how the error occurred. These allegations are minimally probative, at best.

### 4. Motive and Opportunity

The presence of "motive," while not necessary to satisfy the pleading requirements of the PLSRA, may contribute to a strong inference of scienter. *See In re McKesson Hboc Secs. Litig.*, 126 F. Supp.2d at 1269. Here, Plaintiffs contend that Defendants Smolak and Alexander had motive and opportunity to misclassify the leases. Both Defendants stood to receive cash and/or stock bonuses if Hypercom achieved an operating profit for 2004.

The general rule is that incentive compensation is not overly probative on the question of fraud–otherwise, the executives of virtually every corporation in the United States would be subject to fraud allegations. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068-69 (5th Cir. 1994). Thus, the bare fact that Anderson and Smolak would have received bonuses if Hypercom had been profitable in 2004 is minimally probative, at best, on the question whether they acted with scienter.

- 14 -

Moreover, Defendants argue that their decision not to sell shares of Hypercom stock undermines Plaintiffs' "motive" claim.  Because Plaintiffs have made only a very weak "motive" claim, it is unnecessary to address Defendants' argument.

### 5. Core Business

Plaintiffs argue that a defendant's knowledge of a fraud is presumed where it concerns a company's core business.  Doc. # 65 at 14.  Presumably, Plaintiffs are arguing that leasing portals was a "core" business of Hypercom and, as such, Defendants should have known exactly how those leases should have been characterized to comply with GAAP.

There are two problems with Plaintiff's argument.  First, courts have declined to "presume" scienter in the manner suggested by Plaintiffs.  In fact, in *In re Read-Rite Corp. Secs. Litig.*, 335 F.3d 843, 848-49 (9th Cir. 2003)–the case on which Plaintiffs rely for this proposition–the Ninth Circuit refused to impute knowledge to Defendants based on their positions in the company.  Second, even if such a "presumption" existed, it is not clear that the presumption would extend so far as to impute knowledge of the accounting principles applicable to "core" products.

### 6. Hypercom's Management Style

A detail-oriented management style may be considered for the purpose of determining whether scienter has been pled with particularity.  *See Nursing Home Pension Fund, Local, 144*, 380 F.3d at 1234 ("It is reasonable to infer that the Oracle executives' detail-oriented management style led them to become aware of the allegedly improper revenue recognition of such significant magnitude that the company would have missed its quarterly earnings projection but for the adjustments.").

In the present case, Plaintiffs have not alleged that Defendants made the sort of statements that, in *Nursing Home*, supported an inference of scienter.  The only allegation that is even minimally relevant is made by CW-1, who alleges that Smolak received frequent accounts of EMEA sales and "double-checked" all leasing figures.  This single allegation is not enough.  Plaintiffs have failed to allege sufficient facts for this court to consider

- 15 -

Hypercom's detail-oriented management style as supporting a conclusion that Defendants acted with scienter.

### 7. Resignations of Smolak and Alexander

At least one court has stated that resignations following a restatement can be a factor in determining scienter. *See In re Adaptive Broadband Sec. Litig.*, 2002 U.S. Dist. LEXIS 5887, *43 (N.D. Cal. 2002) ("As with the restatement of Adaptive's financials, these changes, taken alone, would not support scienter. But because the changes occurred as adaptive's financials were being restated and as Adaptive was conducting its own internal investigation (which resulted in a determination that the extension of credit to certain customers was unsupportable), they add one more piece to the scienter puzzle.").

Thus, the court will consider the fact that Smolak and Alexander resigned as a factor in its scienter analysis. However, the fact that there were no firings for cause makes this factor only minimally probative.

### B. Plaintiffs' Allegations Considered as a Whole

In support of their argument that Defendants intentionally misrepresented material information, Plaintiffs have properly alleged the following: (1) Hypercom violated GAAP with its 2004 financial representations; (2) Hypercom issued a financial restatement revealing this accounting violation and reducing its revenue by $3.1 million and its net income by $2.1 million; (3) Hypercom issued a statement accompanying the financial restatement providing that there was a significant internal control deficiency; (4) Defendants Alexander and Smolak resigned shortly after the financial restatement; and (5) according to CW-1, EMEA handled the salesman aspect of Hypercom's business, and at the end of each month EMEA would transmit to Smolak its leasing figures and revenues to be "double-checked."[1]

---

[1] At oral argument on January 20, 2006, Plaintiffs appeared to argue that Defendants acted with scienter when they reported that they had reviewed Hypercom's internal controls and that "the company's disclosure controls and procedures are sufficient and operating effectively" because Hypercom did not have an internal audit practice. Plaintiffs failed to provide adequate legal authority in their brief supporting this argument. Therefore, to the extent that Plaintiffs are arguing an alternative basis for why Defendants acted with scienter,

- 16 -

1  Based on these allegations, the court finds that Plaintiffs have failed to meet the
2  difficult standard enunciated in *Silicon Graphics*–plaintiffs must "plead, at a minimum,
3  particular facts giving rise to a strong inference of deliberate or conscious recklessness." *In*
4  *re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d at 979.  Plaintiffs allege little more than the fact
5  that Hypercom issued a financial restatement because of GAAP violations.  The amount of
6  the restatement is not overly probative.  Plaintiffs have failed to allege with particularity how
7  the GAAP violations were so obvious that Smolak and Alexander[2] must have known about
8  the misclassification.  The culpability statement only provides that there were internal control
9  deficiencies, which caused the accounting error.   Such a culpability statement does not
10 establish a strong inference that Defendants misrepresented Hypercom's financial figures with
11 knowledge or deliberate recklessness.  Furthermore, the allegations of one confidential
12 witness in this case fail to raise the level of the inference to "strong."  While Plaintiffs may
13 have alleged facts establishing a reasonable inference of scienter, the standard is a strong
14 inference, which Plaintiffs have not raised.  Therefore, Plaintiffs' claim that Defendants
15 violated Section 10(b) of the Securities Exchange Act of 1934 is dismissed without prejudice.

## IV.    Section 20(a) of the Exchange Act

To prevail on a Section 20(a) claim, "plaintiffs must first allege a violation of § 10(b) or Rule 10b-5." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 (9th Cir. 2002).  Unless Plaintiffs plead scienter with particularity, there cannot be any Section 20(a) liability.  *Id.* Plaintiffs's Section 20(a) claim is also dismissed without prejudice.

## V.    Conclusion

Plaintiffs have failed to plead particularized facts establishing a strong inference that Defendants acted with scienter, as required by the PSLRA.  Because Plaintiffs may be able

---

the court will not address this argument.

[2]As Defendants point out, Plaintiffs' Complaint does not allege any facts establishing a strong inference that Alexander was involved with the incorrect misclassification.  While Defendants have failed to allege the necessary facts suggesting that either Defendant acted with scienter, Plaintiffs' claim is significantly weaker with respect to Alexander.

- 17 -

1  to cure this pleading deficiency, Plaintiffs' Complaint is dismissed without prejudice. They
2  will have thirty days to submit an amended complaint.
3       IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss, Doc. # 53, is
4  granted.
5       IT IS FURTHER ORDERED that Defendants Request for Judicial Notice, Doc. # 55,
6  is granted as to Exhibits 4 and 5 and denied as to Exhibits 2 and 3.
7       IT IS FURTHER ORDERED that Plaintiffs' Amended Complaint, Doc. # 48, is
8  dismissed for failure to comply with the PLSRA's pleading requirements with leave to file a
9  further amended complaint by February 23, 2006.
10      DATED this 24th day of January 2006.

                                _/s/ Neil V. Wake_
                                  Neil V. Wake
                              United States District Judge