**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re Hypercom Corporation Securities Litigation | ) No. CV-05-0455-PHX-NVW ) ) **ORDER** ) |
| This document relates to all actions. | ) |

The Court has before it Plaintiffs' Second Consolidated Amended Class Action Complaint, Doc. # 76; Defendants' Motion to Dismiss, Doc. # 79; Plaintiffs' Response to Defendants' Motion to Dismiss, Doc. # 83; Defendants' Reply to Plaintiffs' Response, Doc. # 90; Defendants' Declaration in Support of their Motion to Dismiss, Doc. # 80; Defendants' Supplemental Declaration, Doc. # 9; and Defendants' Request for Judicial Notice, Doc. # 92.

On January 24, 2006, the court dismissed without prejudice Plaintiffs' Consolidated Amended Class Action Complaint for failure to state a claim. Plaintiffs submitted a Second Consolidated Amended Class Action Complaint ("Amended Complaint"), which Defendants challenge pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, on the ground that the Amended Complaint fails to state a claim against Defendants.

**I.     Statement of the Case**[1]

On February 4, 2004, Hypercom announced that it was restating its financial statements for the first three quarters of 2004 because 3,200 leases entered into by

---
[1] A lengthier description of the facts is contained in the court's January 24, 2006 order.

1 Hypercom's UK subsidiary, Hypercom EMEA, Inc., had been improperly accounted for as
2 sales-type leases, rather than operating leases. Pursuant to Generally Accepted Accounting
3 Principles ("GAAP"), companies structure their leases as either operating leases or sales-type
4 leases. Hypercom's misclassification resulted in a premature recognition of $3.2 million in
5 revenue and $2.1 million in net income.

6     On March 3, 2005, Hypercom filed a Form 8-K with the SEC, attaching a copy of its
7 press release for that day, which stated, "As previously disclosed, the significant internal
8 control deficiency that caused the recent accounting reclassification of certain leases from
9 sales-type to operating leases and gave rise to a restatement of 2004 interim period financial
10 statements, represents a material weakness in internal controls over financial reporting as
11 defined by PCAOB's Auditing Standard No. 2." The same press release also stated that
12 Hypercom expected its independent auditors, Ernst & Young LLP, to issue an adverse
13 opinion with respect to Hypercom's internal controls over financial reporting.

14     Following the press release, Hypercom's stock fell by $1.00 per share, or 18.32
15 percent. Shortly thereafter, Hypercom announced the resignation of John W. Smolak
16 ("Smolak"), its Chief Financial Officer ("CFO").

17     Plaintiffs bring this action against Hypercom and Smolak, alleging (1) that both
18 Defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §
19 78j(b), and its implementing regulation, Rule 10b-5, promulgated in 17 C.F.R. § 240.10b-
20 5(b), and (2) that Smolak violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

21 **II.  Legal Standard**

22     **A.  General Standard Governing Motions to Dismiss**

23     Under Federal Rule of Civil Procedure 12(b)(6), the court may not grant a motion to
24 dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support
25 of his claims which would entitle him to relief." *Barnett v. Centoni*, 31 F.3d 813, 816 (9th
26 Cir. 1994). When analyzing a complaint for failure to state a claim, all factual allegations
27 are taken as true and construed in the light most favorable to the nonmoving party. *See Iolab*
28 *Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1504 (9th Cir. 1994). All reasonable inferences

are to be drawn in favor of the plaintiff. *Jacobsen v. Hughes Aircraft*, 105 F.3d 1288, 1296 (9th Cir. 1997). When a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) (citations omitted). Leave to amend is properly denied "where the amendment would be futile." *DeSoto Yellow Freight Sys.*, 957 F.2d 655, 658 (9th Cir. 1992) (citations omitted).

A court may take judicial notice of any document containing facts that are "capable of accurate and ready determination by resort to resources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Defendants ask the court to take judicial notice of: (1) Hypercom's closing stock price on April 10, 2006, (2) the court reporter's January 20, 2006 transcript of the hearing of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, (3) the court's January 24, 2006 Order, (4) a redline comparison of their first and second amended complaints, and (5) a print-out of the New York Stock Exchange ("NYSE") Listed Company Manual, Section 303A, Corporate Governance Standards, Audit Committee Additional Requirements, Subsection 303A.07(d). Because all of these documents satisfy Rule 201(b)(2), the court takes judicial notice of them.

Plaintiffs request that the court judicially notice (1) Hypercom's April 6, 2004 Schedule 14A Proxy Statement, (2) a Staff Statement on Management's Report on Internal Control Over Financial Reporting, and (3) an article discussing issues arising from the SEC's approval of NYSE listing standards. The court takes judicial notice of Hypercom's April 6, 2004 Schedule 14A Proxy statement but will not take notice of the other two documents. Plaintiffs have not demonstrated why the court should take notice of two articles discussing recent regulations.

Defendants also ask the court to consider *Accounting for Leases, Statement of Financial Accounting Standards No. 13* ("FAS 13"), *An Audit of Internal Controls Over Financial Reporting Performed in Conjunction with an Audit of Financial Statements, Statement on Auditing Standard No. 2* ("AS No. 2"), and NYSE Listed Company Manual,

1 Section 303A, Corporate Governance Standards, Audit Committee Additional Requirements, Subsection 303A.07(d) Section 303A. When ruling on a 12(b)(6) motion to dismiss, a court may consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). Plaintiffs reference both "FAS 13" and "AS No. 2" in their Amended Complaint, and do not question their authenticity. The court therefore considers both documents. In addition, Plaintiffs submitted an article discussing Subsection 303A.07 of the NYSE Listed Company Manual in their brief, but they did not submit the actual document. The court will consider both the version downloaded from the NYSE's website, which Defendants have provided, and Plaintiffs' article discussing the NYSE's listing standards.

**B.     Pleading Requirements in Securities Fraud Actions**

To state a claim for securities fraud under Section 10(b) of the 1934 Act and its implementing regulation, Rule 10b-5, a complaint must overcome three pleading barriers. First, it must comport with Rule 8(a) of the Federal Rules of Civil Procedure, which requires a short and plain statement of the claim.

Second, it must conform with the "particularity" obligations imposed by Rule 9(b) of the Federal Rules of Civil Procedure. *In re GlenFed, Inc. Sec. Litig.*, 42 F. 3d 1541, 1545 (9th Cir. 1994). Rule 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind may be averred generally."

Third, it must meet the pleading requirements provided in the Private Securities Litigation Reform Act ("PSLRA"). The PSLRA amplifies the "particularity" obligations of Rule 9(b) by requiring that the complaint specify "each statement alleged to have been misleading," and by requiring that the complaint specify the reason or reasons why the statement was false or misleading. 15 U.S.C. § 78u-4(b)(1). "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed." *Id.* Moreover, the PSLRA provides that a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter. *Id.* at (b)(2). The required state of mind is either that the defendant acted intentionally or with "deliberate recklessness." *In re Daou Systems, Inc. Sec. Litig.*, 411 F.3d 1006, 1014-15 (9th Cir. 2005). "Recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999); *see also DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002) (stating that in order to allege a strong inference of deliberate recklessness, a plaintiff must state "facts that come closer to demonstrating intent, as opposed to mere motive and opportunity") (citations omitted).

Therefore, a plaintiff must "plead, at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness." *In re Silicon Graphics*, 183 F.3d at 979. A reasonable inference is not enough. *Id.* at 974. A complaint merely alleging that a defendant had the motive and opportunity to commit fraud is insufficient. *Id.* In assessing whether a plaintiff has sufficiently pleaded scienter, courts consider the totality of the allegations. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) (citations and internal quotation marks omitted). Additionally, courts must consider all reasonable inferences, not just those favorable to the plaintiff. *Id.*

Applying these standards, the inquiry before the court is whether the Amended Complaint, read most favorably to Plaintiffs, but considering all reasonable inferences, alleges sufficiently particular facts to raise a strong inference that a given Defendant participated in the making of fraudulent representations or omissions, either with knowledge of their falsity or with deliberate recklessness.

### III. Analysis

On January 24, 2006, Plaintiffs' complaint was dismissed for failure to allege

- 5 -

sufficient facts demonstrating a strong inference that Defendants Smolak and Alexander[2] acted with scienter. In reaching this conclusion, and applying *Nursing Home Pension Fund*'s totality of the circumstances inquiry, the court held that (1) the fact that Hypercom issued a financial restatement for the first three quarters of 2004 because it violated GAAP by improperly classifying leases, (2) the statements of Confidential Witness Number 1, (3) the fact that the individual Defendants stood to receive a bonus if Hypercom was profitable, and (4) the resignations of Smolak and Alexander did not establish a strong inference that Defendants Smolak and Alexander knowingly or with deliberate recklessness improperly classified the leases. The statements of Plaintiffs' other confidential witnesses were not considered because of a failure to comport with *In re Daou Systems, Inc.*, 411 F.3d at 1015 ("[P]ersonal sources of information relied upon in a complaint should be described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.") (citations and internal quotation marks omitted).

In their Amended Complaint, Plaintiffs have alleged additional facts about each confidential witness's background and basis of knowledge. Plaintiffs argue that (1) the confidential witnesses' allegations, viewed in combination with (1) Smolak's professional background, (2) the fact that Smolak was the CFO and had access to nonpublic information, (3) Smolak's resignation, and (4) Hypercom's statement that the financial restatement was the result of a lack of effective internal controls–which Hypercom made after Smolak had previously certified, pursuant to the Sarbanes-Oxley Act ("Sarbanes-Oxley"), 15 U.S.C. § 78m, that Hypercom's internal controls were effective–establish a strong inference that Smolak acted with scienter when misclassifying the leases.

Separately, Plaintiffs allege that Smolak engaged in intentional misrepresentation when certifying Hypercom's internal controls under Sarbanes-Oxley.

Both arguments will be addressed in turn.

---

[2]Alexander is not named as a defendant in the current iteration of the complaint.

**1.     Misclassifying the Leases**

In order to establish a strong inference that Smolak acted with scienter when misclassifying the leases, Plaintiffs need to establish that Smolak was involved in the classification decision and either intended to misclassify the leases or acted with deliberate recklessness in failing to recognize the misclassification. Plaintiffs must do more than merely allege that a financial restatement occurred because of a GAAP violation. *See In re Cylink Secs. Litig.*, 178 F. Supp. 2d 1077, 1082 (N.D. Cal. 2001) ("To be sure, allegations or a failure to follow GAAP, standing alone, do not create a strong inference of scienter. But particular facts about significant and specific violations can support an inference that the individuals responsible for such violations acted with scienter.") (citations and internal quotation marks omitted). Rather, Plaintiffs must allege enough information so that "a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *In re Daou Systems, Inc.*, 411 F.3d at 1017 (citations and internal quotation marks omitted).

**a.     Confidential Witnesses**

"[P]ersonal sources of information relied upon in a complaint should be described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* at 1015 (citations and internal quotation marks omitted). Plaintiffs need not name their sources "so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." *Id.* at 1015-16 (citations and internal quotation marks omitted). In *Daou,* the court concluded that the plaintiffs satisfied the PSLRA requirements for confidential witnesses when they described the witnesses with a high degree of specificity, identified each confidential witness's job description and work responsibilities, and attributed each allegation to a specific witness. *Id.* at 1016.

Plaintiffs have alleged sufficient facts regarding the job descriptions of each confidential witness so as to comport with *Daou*. Thus, the allegations by the individual

confidential witnesses will be considered to determine the probative value of any of the allegations. However, confidential witnesses' unreliable or conclusory allegations will not be considered for purposes of determining whether Smolak acted with scienter.

#### ii. Confidential Witness No. 1

Plaintiffs allege that Confidential Witness No. 1 ("CW-1") is a former Managing Director of EMEA, Hypercom's subsidiary. CW-1 alleges that the drafting of the leases and the classification of the revenue derived therefrom occurred at Hypercom's headquarters in Phoenix. As a former Managing Director, it is likely that CW-1 knows that EMEA did not classify the leases and that the classification occurred in Phoenix.

CW-1 further alleges that the rental agreements were "'very straightforward' and there was no question that they were simply 'strict rental agreements' and not sales or purchase agreements." Doc. # 76 at ¶ 35. The Amended Complaint also provides that "CW-1 stated that there was never 'anything' in any lease contract that would make it unclear that the lease was anything but a simple 'rental' and that, as such, each contract 'needed to be booked as a rental agreement.' While CW-1 is not an accountant, he states that he has worked in sales for more than twenty years, and that even to him this was clear, simply because of the 'language used' in the rental agreements." *Id.*

As the Amended Complaint makes clear, CW-1 is not an accountant, so it is unclear how he would know how to classify a lease pursuant to GAAP.[3] This shortcoming was pointed out in the Court's January 24, 2006 Order, and Plaintiffs have not remedied it.

CW-1's allegations establish only that the lease classification was done at Hypercom's headquarters in Phoenix, not by EMEA.

#### ii. Confidential Witness Number 2

Confidential Witness Number 2 ("CW-2") was a tax accountant in Hypercom's headquarters in Phoenix. He alleges that Smolak and Vreland classified the leases as either

---

[3]Moreover, FAS 13 is a fifty-seven page document explaining how leases should be classified. It is unclear how the language of the lease would automatically dictate the lease's classification.

- 8 -

sales or operating leases and he knows this because the office is small and "no one would have had this duty except from the CFO or Controller." Doc. # 76 at ¶ 41. This statement suggests that Smolak was involved in the misclassification.

### iii.     Confidential Witness Number 3

Confidential Witness Number 3 ("CW-3") was a "General Ledger Accountant" at Hypercom's headquarters. According to CW-3, all accounting transactions are recorded in the general ledger. In addition,

> CW-3 stated that all decisions to book revenue were made jointly by defendant Smolak, Vreland, and Hypercom senior vice president of finance, treasury and investor relations, Tsujita. According to CW-3, Smolak and Vreland maintained "very tight" control over the accounting department and "questioned everything" because Hypercom had no internal auditing person or group. CW-3 stated that the booking of revenues from operating leases as revenue from sales-type leases was done "intentionally."
> CW-3 further stated that the finalization on the wording of the leases, and the decision whether to treat them as sales or operating leases was made at Hypercom headquarters and not out in the field by salespeople speaking with customers. CW-3 specifically stated that the decisions concerning the leases were made by Vreland and Smolak. CW-3 stated that because of this fact, "Smolak knew what was going on," that review of the leases was "part of his job" and that he was "very detail oriented" and "all over [the lease issue]."
> When questioned whether the improper classification could have been accidental or simply a mistake that went "unnoticed," CW-3 replied that the idea of a simple mistake was "hard to swallow, given how detail-oriented they were" with the accounting issues. CW-3, who was also an accountant, concurred that the classification of the leases was "obvious" and that, accordingly, it is a "mystery" how the misclassification could, theoretically, have gone unnoticed.

Doc. # 76 at ¶¶ 45-47.

In addition to stating that the lease classification decision was made in Hypercom's headquarters, CW-3 states that the misclassification was intentional. However, CW-3 does not provide any facts establishing why this is the case other than to assert that the correct classification was "obvious" and that "the idea of a simple mistake was 'hard to swallow, given how detail-oriented they were' with the accounting issues." These are not facts but conclusions. CW-3's assertion that the misclassification was "obvious," without alleging any facts other than that Smolak was "detail-oriented," is insufficient and does not establish an inference that Smolak intentionally or with deliberate recklessness misclassified the leases.

- 9 -

#### iv.     Confidential Witness Number 4

Confidential Witness Number 4 ("CW-4") also worked on Hypercom's General Ledger. The Amended Complaint provides that "[a]ccording to CW-4, counting revenue from the operating leases as sales-type leases was an intentional effort by Defendants to increase and 'inflate' Hypercom's bottom line profits. According to CW-4, Defendants only stopped their practices because the Company's outside auditor Ernst & Young 'caught them' and refused to sign off on the Company's financials." Doc. # 76 at ¶ 49. The remainder of CW-4's allegations involve whether Hypercom had adequate internal controls.

While CW-4 alleges that Smolak intentionally misclassified the lease in order to "'inflate' Hypercom's bottom line profits," he cites no facts supporting this conclusion. Such conclusory allegations are insufficient.

#### v.     Confidential Witness Number 5

Confidential Witness Number 5 ("CW-5") was Hypercom's Corporate Accounting Manager. Relevant to Smolak's involvement with the leases, "CW-5 further stated that because the office was so small one would 'be aware of what their boss or boss' boss did on a daily basis.' CW-5 stated that it was Smolak's job to review the leases in question and that 'all legal paperwork and accounting for them was done here in the U.S.' and that even 'if a customer in England wanted a rental agreement, the agreement was done [in the U.S.].'" Doc. # 76, ¶ 55. While relevant to whether Smolak was involved with the lease classification, CW-5 does not allege any facts establishing that Smolak intentionally or with deliberate recklessness misclassified the leases.

#### vi.     Confidential Witness Number Six

Confidential Witness Number Six ("CW-6") was the Accounts Payable Supervisor. CW-6's allegations support the conclusion that the Accounting Department at Hypercom was small and that Smolak was involved with accounting decisions. However, again, there are no allegations establishing that Smolak knew about the misclassification or acted with deliberate recklessness in misclassifying the leases.

### vii.  Confidential Witnesses' Allegations

In sum, at most the confidential witnesses have alleged facts suggesting that Smolak was involved with the lease classification. There are no facts alleged, however, that suggest that Smolak intentionally misclassified the leases. Only unsupported, conclusory allegations were made in this respect, which are insufficient to establish scienter under the PSLRA. *See In re Dreamworks Animation SKG, Inc., Sec. Litig.*, no. 05-03966, 2006 U.S. Dist. LEXIS, 24456, at *20 (C.D. Cal. 2006). The confidential witnesses' allegations alone, therefore, do not establish a strong inference that Smolak acted with scienter.

### b.  Other Indicia of Scienter

Plaintiffs allege that the confidential witnesses' statements, combined with additional factors, demonstrates that Smolak acted with scienter when misclassifying the leases. The other factors Plaintiffs point to are (1) Smolak's professional background, (2) the fact that Smolak was the CFO and had access to nonpublic information, (3) Smolak's resignation, and (4) Hypercom's statement that the financial restatement was the result of a lack of effective internal controls.

### i.  Smolak's Professional Background

Plaintiffs point to Smolak's professional background as evidence that he acted with scienter. Plaintiffs, however, do not provide any authority supporting this argument, and it appears to be an attempt to circumvent the PSLRA's requirement that plaintiffs allege specific facts establishing scienter. Even successful professionals can make innocent mistakes. The fact that Smolak had professional experience at the time of the misclassification does not suggest that the mistake must have been intentional.

### ii.  Smolak's Position as the CFO

Plaintiffs fail to explain, with any specificity, the import of their second "factor." To the extent Plaintiffs are suggesting that an inference of scienter arises whenever a mistake is made by a CFO with access to nonpublic information, this argument is rejected. *See In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) ("Defendants are correct in their argument that plaintiffs must do more than allege that these key officers had

- 11 -

1  the requisite knowledge by virtue of their 'hands-on' positions, because that would eliminate
2  the necessity for specially pleading scienter, as any corporate officer could be said to
3  possess the requisite knowledge by virtue of his or her position.").

4  In addition, to the extent that Plaintiffs reiterate their argument that Smolak must
5  have known the accounting treatment of the EMEA leases because they were "core"
6  products, this argument is also rejected. The two cases that Plaintiffs cite are unavailing.
7  *See No. 84 Employer Teamster Joint Council Pension Trust Fund v. Am. West Holding*, 320
8  F.3d 920, 943 n. 21 (9th Cir. 2003) (concluding that it was "incredulous" for the Board
9  Members of American West to state that they were unaware of the repurchasing
10 authorization or the fact that the FAA had indicated it was considering penalties of up to $11
11 million, given the importance of those two issues); *In re Complete Mgmt.*, 153 F. Supp. 2d
12 314, 325-26 (S.D.N.Y. 2001) (imputing to the individual defendants knowledge that the
13 company's largest client was engaged in fraudulent medical practices, which the company
14 was under contract to manage).

15 Both of these cases involve situations in which it was not believable that the
16 defendants were unaware of the particular facts because of their central importance to the
17 company. Here, by contrast, there is no indication that the EMEA leases are "core"
18 products, as the EMEA leases were a small portion of Hypercom's overall revenue. In
19 addition, it requires a big inference to conclude that knowledge of a "core" product includes
20 knowledge of how that product is classified for accounting purposes. Accepting Plaintiffs'
21 argument would result in a conclusion that scienter is sufficiently alleged whenever a CFO
22 is named in a securities class action involving a GAAP violation.

### iii. Smolak's Resignation

24 Plaintiffs allege that Smolak's resignation is evidence of scienter. However, Smolak
25 was not fired for cause, and Hypercom did not publicly offer a reason–such as fraud–for his
26 resignation. *Compare In re McKesson Hboc Sec. Litig.*, 126 F. Supp. 2d 1248, 1273-74
27 (N.D. Cal. 2000) (holding that multiple public statements by the new chairman and CEO
28 stating that the terminated executives were fired for cause because of their participation in

- 12 -

fraudulent accounting practices was strong circumstantial evidence of fraud) *with In re CornerStone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005) (stating that *In re McKesson* did not apply because "in [*In re McKesson*], the officials were terminated on the publicly-stated grounds that they 'should have known, or did know, of the problems.' In the present action, by contrast, there is no evidence that defendants' termination was based on fraud"). Therefore, as stated in the January 24, 2006 Order, the fact that Smolak resigned is only minimally probative in a scienter analysis.

### iv.   Ineffective Internal Controls[4]

On March 3, 2004, Hypercom stated that a material weakness in Hypercom's internal controls led to the financial restatement. Specifically, Hypercom recognized three deficiencies: (1) "an inappropriate level of review of certain significant financial statement accounts requiring a higher degree of judgment and estimates"; (2) "insufficient analysis, documentation, review, and oversight of the financial statements of certain foreign subsidiaries during consolidation"; and (3) "insufficient staffing of the accounting and financial reporting function. The finance and accounting function requires additional personnel to identify and address the application of recent accounting literature and internal control activities." Hypercom's Form 8-K, and Exhibit 99 thereto, filed with the Securities and Exchange Commission on March 21, 2005. Although Hypercom recognized the three deficiencies listed above, Plaintiffs rely on an alleged lack of an internal audit as evidence that Smolak knew about the misclassified leases.

Plaintiffs cite a number of cases for the proposition that a lack of internal controls can be probative on the issue of scienter. Doc. # 83, at 17 n. 12. While plaintiffs are correct in their assertion, the cases relied on by Plaintiffs involve far more egregious facts than those

---

[4] Although Plaintiffs did not clearly articulate that Hypercom's lack of adequate internal controls supports the conclusion that Smolak intentionally misclassified the leases, they cited authority suggesting that they intended to make this argument. Therefore, Plaintiffs' brief will be treated as making this argument. Plaintiffs separately argue that Smolak made a material misrepresentation when he stated that Hypercom had adequate internal controls. This separate allegation is addressed below.

- 13 -

alleged in this case. *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 483-84, 492 (S.D.N.Y. 2004) (company lost records to the point that Ernst & Young was unable to conduct an audit); *In Re Rent-Way Secs. Litig.*, 209 F. Supp. 2d 493, 509 (W.D. Pa. 2002) (company had clearly deficient accounting system); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) (same); *Miller v. Material Sciences Corp.*, 9 F. Supp. 2d 925, 928 (N.D. Ill. 1998) (entirely no audit practice for a year). In addition, these cases demonstrate that a lack of internal controls, whatever the facts may be, is considered in combination with other facts to determine whether a plaintiff has alleged facts establishing a strong inference of scienter.

As discussed below, Plaintiffs reliance on the fact that Hypercom did not have adequate internal controls because Hypercom did not have an "internal" audit is misplaced. Plaintiffs have failed to establish that a company cannot outsource its internal audit. In addition, the fact that Hypercom issued a press release recognizing a lack of effective internal controls, is not overly probative as to whether Smolak intentionally misclassified the leases. Presumably every company that issues a financial restatement because of GAAP errors will cite as the reason a lack of effective internal controls.

### c. Plaintiffs' Allegations Considered as a Whole

Plaintiffs have alleged few additional facts beyond those contained in their first amended complaint. The addition of the confidential witnesses' statements suggests, at most, that Smolak was involved at some point with the lease misclassification, either in the original classification decision or on review. It remains the case that none of Plaintiffs' confidential witnesses has alleged facts establishing that Smolak intentionally or with deliberate recklessness misclassified the leases. Conclusory allegations on this issue are insufficient to establish a strong inference of scienter. Were it otherwise, general disparagement of insiders by insiders would be enough for the scienter pleading requirement of the PSLRA.

Thus, evaluating all of Plaintiffs' allegations together, Plaintiffs have shown little more than that a financial restatement was issued to correct accounting errors. Moreover,

- 14 -

Plaintiffs have failed to allege facts establishing that these GAAP errors were more than technical errors based on the incorrect application of FAS 13. Even considering Hypercom's subsequent admission that the accounting errors were the result of inadequate internal controls, Plaintiffs have failed to plead particularized facts establishing a strong inference of scienter with respect to the misclassificaton of the leases.

### B.     Plaintiffs' Internal Controls Allegation

Plaintiffs also allege that Smolak's Sarbanes-Oxley certifications in May, August, and November–in which Smolak certified that Hypercom had adequate internal controls–were knowing material misrepresentations. Plaintiffs rely on the fact that Hypercom did not perform an internal audit to establish that Smolak acted with scienter when certifying Hypercom's internal controls.[5]   Doc. # 76, ¶¶ 76, 82. This reliance is misplaced. The authority Plaintiffs cite fails to support this proposition.

Plaintiffs first quote from the *Staff Statement on Management's Report on Internal Control Over Financial Reporting*. Doc. # 83 at 14 ("'The **staff believes that efficient and effective assessments depend on the internal audit** and other company personnel and external auditors who are 'on the ground' closest to the assessment.'") (emphasis added by Plaintiffs). Plaintiffs do not explain why this statement, which clearly references the use of external auditors, establishes that the failure to utilize an internal audit proves the ineffectiveness of internal controls.

Plaintiffs also cite the New York Stock Exchange's listing standards for the proposition that listed companies must perform an internal audit. However, Plaintiffs did not provide an accurate citation of that source, which explicitly allows a company to

---

[5] Although Plaintiffs allege that there are "other reasons," in addition to the lack of an internal audit, showing that Smolak's certifications were knowingly false, they do not identify any such reasons in the Amended Complaint.

- 15 -

outsource its internal audit.[6] The comment, in its entirety, provides: "Listed companies must maintain an internal audit function to provide management and the audit committee with ongoing assessments of the company's risk management processes and system of internal control. A listed company may choose to outsource this function to a third party service provider other than its independent auditor." NYSE Listed Company Manual, Section 303A, Corporate Governance Standards, Audit Committee Additional Requirements, Subsection 303A.07(d) Section 303A. Thus, the NYSE listing requirements unambiguously condone the use of outside auditors. Moreover, Plaintiffs' confidential witnesses allege that Hypercom had two external auditors and that quarterly and annual audits were performed, undermining any claim that Hypercom had entirely no audit practice.[7]

The case law Plaintiffs cite is similarly unavailing. First, Plaintiffs do not cite any cases in which the alleged misstatement is the actual Sarbanes-Oxley certification. Second, the primary case on which Plaintiff relies, *In re Lattice Semiconductor Corporation Secs. Litig.*, No. 04-1255, 2006 U.S. Dist. LEXIS 262 (D. Or. 2006), involves facts far more telling than those alleged in this case. The *Lattice Semiconductor* plaintiffs pleaded that a particular individual had improperly altered accounting journals in order to artificially inflate revenue, which the defendant-company admitted to be the case. *Id.* at *48-49. The plaintiffs also pled that the "particular individual" would "not have manually overridden accounting entries without authorizations from upper management." *Id.* at 51. In addition,

---

[6] In their brief, Plaintiffs quote the NYSE listing standards as: "**Listed companies must maintain an internal audit function** to provide management and the audit committee with ongoing assessments of the company's risk management processes and **system of internal control**. Companies must comply with the requirement by the first annual meeting after January 15, 2004, or by October 31, 2004." Doc. # 83 (emphasis added by Plaintiffs). Plaintiffs cited an article rather than the actual listing standards, which probably explains their failure to provide an accurate quotation.

[7] According to the Complaint, "CW-6 stated that all Hypercom audits were outside audits, and were conducted by E & Y or Foothill." CW-2 also stated that auditing was performed by "E & Y" and "Foothill" and that these outside audits occurred on a quarterly basis.

- 16 -

in the third quarter, the defendants who provided the Sarbanes-Oxley certifications omitted a certification that had been present in the first and second restated quarters, suggesting an awareness that an individual was fraudulently inflating revenue. *Id.* at 49-51. These are significant differences from the facts of this case.

In addition, at most, the *Lattice Semiconductor* court concluded that the Sarbanes-Oxley certifications gave rise to an inference of scienter, but did not alone establish a strong inference of scienter:

> The Sarbanes-Oxley certifications, in combination with plaintiffs' allegations of regular finance meetings, extensive access to databases, periodic reports and special reports, and the allegations that they were micromanagers, are sufficient to create a strong inference of actual knowledge or of deliberate recklessness. The inference is further strengthened by allegations of business reverses which would create a motive for overstating revenue; the magnitude of the GAAP violations; the statements of confidential witnesses that Hoyt would not have manually overridden accounting entries without authorization from upper management; and the defendants' apparent ratification of Hoyt's actions by reemploying Hoyt after his purported termination.

*In re Lattice Semiconductor*, No. 04-1255, 2006 U.S. Dist. LEXIS at *50-51.

In sum, Smolak incorrectly certified the effectiveness of Hypercom's internal controls. However, an incorrect Sarbanes-Oxley certification does not, by itself, create a strong inference of scienter. *See In re Invision Techs., Inc. Sec. Litig.*, No. 04-03181, 2006 U.S. Dist. LEXIS 12166, *21 (N.D. Cal. 2006) (declining to find that the plaintiff had adequately pleaded scienter by showing a misstatement in a Sarbanes-Oxley certification).

Thus, Plaintiffs have failed to establish that Smolak knowingly or with deliberate recklessness misrepresented that Hypercom had effective internal controls.[8] The authorities cited by Plaintiffs allow companies to use outside auditors, and Plaintiffs have not alleged facts establishing that Hypercom did not outsource its "internal" audit. As stated above, two

---

[8] Plaintiffs also cite *United States v. Wittig*, 425 F. Supp. 2d 1196, 1217 n. 41 (D. Kan. 2006), for the proposition that "monitoring internal controls is a function of an auditing department, and internal audit function and internal controls are synonymous terms referring to the same context." Even assuming that this is a correct statement of *Wittig*, Plaintiffs have failed to allege that Hypercom did not perform an internal audit. Plaintiffs have failed to show any authority establishing that Hypercom cannot outsource this function.

of Plaintiffs' confidential witnesses explicitly stated that Hypercom had two outside auditors and that audits were performed on a quarterly and annual basis. Plaintiffs do not allege any other facts suggesting that Smolak's misrepresentation was made with the requisite mental state.

### IV.     Section 20(a) of the Exchange Act

To prevail on a Section 20(a) claim, "plaintiffs must first allege a violation of § 10(b) or Rule 10b-5." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 (9th Cir. 2002). Because Plaintiffs have failed to plead scienter with particularity, there cannot be any Section 20(a) liability. Plaintiffs' Section 20(a) claim is therefore also dismissed.

### V.     Dismissal with Prejudice

Plaintiffs' Amended Complaint therefore fails to state a claim upon which relief can be granted. This raises the question whether the Amended Complaint should be dismissed with or without leave to file an amended complaint. "When the allegations in a securities fraud complaint are inadequate to establish a strong inference of deliberate recklessness, dismissal with leave to amend is the most prudent course of action, unless it is clear that pleading could not be saved by amendment." *In re Metawave Communs. Corp. Sevs. Litig.*, 298 F. Supp. 2d 1056, 1091 (W.D. Wash. 2003) (citing *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052-53 (9th Cir. 2003). "[W]hen amendment would be futile, there [is] not need to prolong the litigation by further amendment." *Litpon v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002).

In its January 24, 2006 Order, the court articulated the pleading deficiencies in Plaintiff's Consolidated Amended Class Action Complaint. In their Amended Complaint, Plaintiffs made little effort to address those deficiencies, alleging only a few additional facts. At oral argument on June 28, 2006, Plaintiffs stated that they did not have any additional facts that they could allege concerning scienter if granted the opportunity. Thus, granting Plaintiffs leave to amend would be futile.

1    IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss (Doc. # 79) is
2 granted dismissing Plaintiffs' Second Consolidated Amended Class Action Complaint (Doc.
3 # 76) with prejudice.
4    IT IS FURTHER ORDERED that the clerk shall enter judgment dismissing this
5 action with prejudice. The clerk shall terminate this action.
6    DATED this 5th day of July 2006.

_____
Neil V. Wake
United States District Judge